**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| BEVERLY A. JONES, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-05-712 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF | § | |
| SOCIAL SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON**
**MOTIONS FOR SUMMARY JUDGMENT**

On March 6, 2006, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636(c). The case was then transferred to this court. Cross-motions for summary judgment have been filed by Plaintiff Beverly A. Jones ("Plaintiff," "Jones") and Jo Anne B. Barnhart ("Defendant," "Commissioner"), in her capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry # 13; Commissioner's Motion for Summary Judgment ["Defendant's Motion"], Docket Entries # 11, 12). Defendant has filed a response to Plaintiff's motion, and after considering the pleadings, the evidence submitted, and the applicable law, the court ORDERS that Plaintiff's motion is GRANTED, and that Defendant's motion is DENIED. The SSA's final decision on this matter is reversed, under the fourth sentence of 42 U.S.C. § 405(g), and the case is remanded, with instructions to the administrative law judge to develop the record further with regard to Jones's rheumatoid arthritis and fibromyalgia; the effect of her obesity on her other impairments; and the limitations, if any, to her residual functional capacity based on her Global Assessment of Functioning ("GAF") score.

## 1.      Background

On March 15, 2002, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act").  (Exhibit ["Ex."] 1, Transcript ["Tr."] at 64-66).  In her application, Plaintiff claimed that she had been unable to work since January 11, 2002, as a result of fibromyalgia,[1] polymyalgia,[2] myositis NOS,[3] depression,[4] and Barrett's syndrome.[5]  (Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment ["Plaintiff's Memorandum"] at 3; Tr. at 73).  There is no dispute that Jones was insured for disability benefits through the date of the ALJ's decision.[6]  (Tr. at 24).  The SSA denied her application on July 17, 2002, after deciding that she is not disabled under the Act.  (Ex. 1A, Tr. at 35; Ex. 1B, Tr. at 37).  Plaintiff petitioned, unsuccessfully, for a reconsideration of that decision.  (Ex. 2A, Tr. at 36).

Following the SSA's initial denial of her claim, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Ex. 4B, Tr. at 48).  That hearing took place on December 5, 2003, before ALJ Richard L. Abrams.  (Tr. at 23-33).  Plaintiff appeared and testified at the hearing, and she was accompanied by her attorney, Donald Dewberry.  (Tr. at 23).  The ALJ also heard testimony

---

[1] "Fibromyalgia" is "a form of nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 632 (5th ed. 1998).  "Common sites of pain or stiffness can be palpated in the lower back, neck, shoulder region, arms, hands, knees, hips, thighs, legs, and feet.  Physical therapy, nonsteroidal antiinflammatory drugs, and muscle relaxants provide temporary relief."  Id.

[2] "Polymyalgia" is "a chronic episodic inflammatory disease of the large arteries."  Id. at 1290.

[3] "Myositis" is an "inflammation of muscle tissue, usually of voluntary muscle."  Id. at 1074.  "NOS" is the abbreviation for "not otherwise specified."  MSN ENCARTA, http://encarta.msn.com/dictionary_1861633820/n_o_s.html.

[4] "Depression" is defined as "an abnormal emotional state characterized by exaggerated feelings of sadness, melancholy, dejection, worthlessness, emptiness, and hopelessness that are inappropriate and out of proportion to reality."  MOSBY'S at 467.

[5] Also known as "Barrett's esophagus," it is "a disorder of the lower esophagus marked by a benign ulcerlike lesion in columnar epithelium, resulting most often from chronic irritation of the esophagus by gastric reflux of acidic digestive juices."  Id. at 171-72.

[6] Jones's earnings record indicates that her "date last insured" will be in December 2007.  (Tr. at 67).

from three expert witnesses:  a psychiatrist, Nancy M. Tarrand, M.D. ("Dr. Tarrand"); an internist

and immunologist, Vern O. Laing, M.D. ("Dr. Laing"); and a vocational rehabilitation counselor,

Tom King ("Mr. King").  (*Id.*).

On February 23, 2004, the ALJ engaged in the following five-step, sequential analysis to

determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact,

disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.  If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir.

1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th

Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this

analysis, Jones has the burden to prove any disability that is relevant to the first four steps.  *Wren*,

925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show

that she is able to perform other work that exists in the national economy.  *Myers v. Apfel,* 238 F.3d

617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not

disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Plaintiff has "major depressive disorder and a pain syndrome."  (Tr. at 25). Although he determined that these impairments, alone or in combination, are severe, he concluded, ultimately, that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any

disabling impairment in the applicable SSA regulations.[7]  (Tr. at 25, 32).  He also found that Jones is unable to return to her previous work as a meat wrapper.[8]  (Tr. at 30, 32).  At step five of his analysis, however, he found that she has the residual functional capacity to perform other work that is available in the national economy.  (Tr. at 32).  He determined that, although her limitations prevent her from doing a full range of light work, she can still manage to meet the exertional demands of jobs that are more than strictly sedentary.  (*Id.*).  He also found that a significant number of such jobs are available to her and he specifically referenced work as an information clerk, an office helper, and a "sorter."  (*Id.*).  For that reason, the ALJ concluded that Plaintiff is "not under a 'disability,' as defined in the Social Security Act," and he denied her application for benefits.  (Tr. at 32-33).

On March 5, 2004, Plaintiff requested an Appeals Council review of the ALJ's decision.  (Tr. at 17).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On December 30, 2004, the Appeals Council denied Jones's request, concluding that no reason for review existed under the regulations.  (Tr. at 6).  In that denial, the Appeals Council addressed, specifically, some of the arguments Plaintiff raised for reversal:

> We . . . audited the hearing tape to determine if [Dr. Laing] commented on the effects of obesity when he testified.  In response to questioning from the claimant's representative, Dr. Laing verified that he considered obesity in his evaluation.  The

---

[7] A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations.  *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

[8] This is the only job title cited by the ALJ, or either party, as relevant to Jones's work history.

[ALJ] also noted the presence and effects of obesity in his assessment of the claimant's impairments (third paragraph, page 4; second paragraph, page 5).[9]

We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. at 7).  With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On March 4, 2005, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Original Complaint ["Complaint"], Docket Entry # 1).

## 2.    Standard of Review

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *Johnson*, 864 F.2d at 343.

---

[9] Defendant concedes that the ALJ did not consider the effect of Jones's obesity on her ability to work. (Defendant's Response to Plaintiff's Motion and Memorandum for Summary Judgment, Docket Entry # 15, at 6-7).

3.      **Discussion**

Plaintiff claims that she became disabled on January 11, 2002, because of the pain and limiting effects of fibromyalgia, polymyalgia, myositis, depression, and esophageal lesions. (Plaintiff's Memorandum at 3; Tr. at 73). She asks this court to reverse the Commissioner's decision to deny her disability benefits, and to render judgment in her favor, for a number of reasons. First, she claims that the ALJ erred, at step two of his analysis, because he failed to explain his finding that her fibromyalgia, obesity, lumbar spine pain,[10] problems with her left knee, rheumatoid arthritis,[11] cervical spine pain, congenital hypertrophy of the left eye,[12] and irritable bowel syndrome[13] were not severe. (Plaintiff's Memorandum at 7-8). She also challenges the ALJ's failure to consider her obesity in assessing her actual ability to perform gainful employment. (*Id.* at 8). Next, Plaintiff claims that the ALJ erred in rejecting the findings by her treating physician, Joshua Michael Gold, M.D. ("Dr. Gold"), on the limitations caused by her rheumatoid arthritis. (*Id.*). In addition, Plaintiff argues that the ALJ erred because he did not fully consider the findings by Dr. M.R. Prabhu ("Dr. Prabhu"), a psychiatrist who examined her on behalf of the state.[14] (*Id.*). Finally, Plaintiff maintains that the expert testimony elicited from Dr. Laing does not constitute substantial evidence in support of the ALJ's decision. (*Id.*). Defendant insists, however, that the ALJ properly considered all of the

---

[10] The "lumbar spine" is the part of the spine located in the lower back, specifically, "between the thorax and the pelvis." MOSBY'S at 960.

[11] "Rheumatoid arthritis" is "a chronic, inflammatory, destructive, sometimes deforming, collagen disease that has an autoimmune component." *Id.* at 1421.

[12] "Congenital hypertrophy of the retinal pigment epithelium" is an "opthalmological malady," characterized by a "decay of the retina." THEFREEDICTIONARY.COM, http://acronyms.thefreedictionary.com/CHRPE (Fairiex.Inc. 2005).

[13] "Irritable bowel syndrome" is defined as "abnormally increased motility of the small and large intestines, generally associated with emotional stress." MOSBY'S at 875.

[14] Referring to pages 225-29 of the transcript.

available evidence, and that he followed the applicable law in determining that Jones is not disabled. (Defendant's Response at 3-4).

In evaluating these arguments, the court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings, and whether the proper legal standards were applied. *Myers*, 238 F.3d at 619.  To do so, the court must weigh the following four factors:  the objective medical facts;  the diagnoses and opinions from treating physicians on subsidiary questions of fact;  Plaintiff's own testimony about pain;  and Plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.  Any conflict in the evidence is to be resolved by the ALJ and not the court. *Newton*, 209 F.3d at 452.

### a.      Educational Background, Work History, and Present Age

At the time of the administrative hearing, Jones was 54 years old, and had completed high school, as well as some college courses.  (Tr. at 24, 441-43).  Jones testified that she had worked as a meat wrapper since 1977, but that her physical condition caused her to quit in January 2002.  (Tr. at 443-45).

### b.      Subjective Complaints

In her application for benefits, Plaintiff stated that she had "pain (chronic) in my feet (heels), shoulders, neck, hands, arms, medication, headaches[,] legs and body aches, so severe, I sometimes can't explain the area."  (Ex. 1, Tr. at 73).  She added that, "My feet hurt all the time.  I have plantar fascitis."[15]  (Tr. at 81).  In addition, she said that:

> I have been having this same problem or illness for 8 yrs.  It has depress[ed] me so, because I am not getting better[.]  [T]he work force has progress[ed] my illness due to the repetitive movements of my hands, arms & shoulder & neck.  I tend to get worst in the cold & I am unable to function because my muscle goes in to defense. I try not to over medicate because then I'm too drowsy.  I've tried to continue working but I have found it to be impossible.

---

[15] "Plantar fascitis" refers to inflammation on the sole of the foot.  *See* MOSBY'S at 617, 1272.

(Tr. at 80-81).  On the Daily Activity Questionnaire that was submitted to the SSA, Jones reported that, "I am afraid to go out alone because I hurt so bad I become dizzy & light headed & forget where I am." (Ex. 4, Tr. at 86).  She also stated that she moves very little throughout the day, because the pain in her shoulder, arms, and neck is so great.  (Tr. at 87).  She added that her physical ailments impede her ability to tend to her personal care, and that her husband and daughter perform all household chores.  (*Id.*)  She further reported that she has memory problems, which have proven very upsetting; she has difficulty finishing things on time because of her limited mobility; she is physically drained by any mental or physical activity; and she becomes angry and upset, often to the point of tears, when she is faced with changes in her routine, or stress, pressure, or criticism.  (Tr. at 87-89).

On June 17, 2002, Jones was examined by Dr. Prabhu, a psychiatrist, at the request of the state.  (Ex. 10F, Tr. at 225). Dr. Prabhu's records recite Jones's own description of her condition, as follows:

> Mrs. Jones has frequent tearful episodes, but she denies suicidal ideation.  She reports low energy, and motivation, and isolation.  She reports difficulty falling asleep and EMA's,[16] significant problems with recent memory and concentration, and getting lost easily.  She admits to auditory hallucinations, and hears a male voice calling her name.  She reports increased anxiety, but denies panic attacks.  She does admit to, "getting hysterical," and screaming when she get[s] anxious or frustrated. . . .  Her appetite is decreased.  She reports that she was a meat wrapper for a couple of months [sic], and she would try to do her work while taking large doses of medication, but it did not stop the pain in her neck, shoulders, and arms.  "I tried to tell my mind to ignore it but only became hysterical and had to go to the emergency room."  She has not made any attempts to return to work, due to not being able to stand and walk for any length of time, and not being able to handle stress.  She has never been hospitalized for psychiatric treatment, and is not currently seeing a psychiatrist.  She was prescribed zoloft 100 mg daily, by her medical physician, Dr. Sim.  Ms. Jones reports that the medication is somewhat helpful, "but not like it should be," and sometimes leaves her feeling lethargic.

(Ex. 10F, Tr. at 225-26).  During the examination, Jones also told Dr. Prabhu that "her illness is getting worse," adding that "she is alright as long as, 'I don't have to make decisions, have anyone

---

[16] Presumably "early morning awakenings."  *See* Ex. 6F, Tr. at 198; THEFREEDICTIONARY.COM/endogenous depression & early morning wakening (EMW).

depend on me, or have people rushing me.'"  (Tr. at 226).  Dr. Prabhu reported Jones's "chief complaints" to be hopelessness, anxiety, and a feeling of worthlessness.  (Tr. at 225).  Jones reported to Dr. Prabhu that, "I feel like I am a hardship on my family."  (*Id.*).

At the hearing, Jones testified that she has suffered from rheumatoid arthritis since 1994, explaining that the disease first manifested itself as pain in her feet, ankles, knees, legs, hips, lower back, elbows, shoulders, neck, and hands.  (Tr. at 448-49).  She then began to also experience weakness in her limbs that would sometimes cause her to fall.  (*Id.*).  She testified that she had been prescribed pain medications, but that the side effects impaired her ability to function at work—she "had to adjust [her] attitude," would break out in sweat, suffered decreased mobility, and could not reach things very well; her pace was slowed; and she had to take twice as many breaks as the other employees.  (Tr. at 457).  Her medications also caused her to be lethargic and unmotivated.  (Tr. at 461-62).  Plaintiff further testified that she could lift items weighing no more than two pounds, and that, after standing in one spot for 10 to 15 minutes, "It feels like my back is going to cave in, and my legs become weak," and "I'm in tears."  (Tr. at 461).  She told the ALJ, in addition, that she cannot use her hands and fingers in any consistent manner.  (Tr. at 460).  When asked whether she could "move [her] fingers or hands like a piano player on a continuous basis," Jones replied, "Not at all."  (*Id.*).

Jones also explained the way in which the pain she experienced affected every aspect of her day.  In fact, she testified that a mere touch is painful to her.  (Tr. at 454).  She told the ALJ that she no longer wears a bra "[b]ecause the pain is so excruciating around my shoulders and around my breast area.  It's like it pulls from my neck."  (*Id.*).  She also told him that she has trouble combing her hair, because the pain will not allow her to hold up her arms long enough to do so.  (Tr. at 455).  Jones testified that, six months before the hearing, she began using a cane to help maintain her balance.  (Tr. at 456).  She also stated that she no longer drives a car, because she suffers from panic

attacks; that she does not sleep at night, because of her pain; and that she cries frequently during the day.  (Tr. at 464-65).

Jones conceded that she is obese, as she is five feet, six inches tall, and weighed 252 pounds three weeks before the hearing.  (Tr. at 459).  Jones explained that her weight causes her problems in maneuvering, lifting, bending, standing, and sitting.  (*Id.*).  She also stated that she had participated in a weight management program at Methodist Hospital, and had attempted approximately five diets on her own, with only limited success.  (Tr. at 459-60).

Jones testified that she stopped working on January 11, 2002, because she "could not tolerate the pain any further," particularly the pain in her hands and arms.  (Tr. at 445).  She said that she "could not use [her] hands to wrap [meat], and the pain would excruciate [sic] down [her] neck and shoulder -- in [her] arms."  (Tr. at 446).  She also claimed to have missed work regularly due to hospital emergency room visits or arthritis treatments that precluded a return to her job.  (*Id.*).  She explained that, after being diagnosed with fibromyalgia, she began taking Plaquenil,[17] but had to stop, because it caused ruptures to the blood vessels in the back of her eyes, a condition for which she was later treated by an ophthalmologist.  (Tr. at 450-51).  When questioned, she said that, as a meat wrapper, the heaviest objects she had to lift were 70-pound cases of chicken, but that she had to lift those every day.  (Tr. at 444).  Jones also testified that the arthritis treatment, "Remicade[18] infusions," lasted approximately three hours, and provided initial relief, but subsequently caused nausea and skin eruptions.  (Tr. at 452).  As a consequence, other medication was prescribed to alleviate those side

---

[17] Plaquenil is "an antimalaria, antiarthritis, and lupus-suppressing drug." THE MOSBY MEDICAL ENCYCLOPEDIA 612 (Rev. ed. 1992).  "Lupus" is "a long-term swelling disease affecting many systems of the body. The disease includes severe swelling of the blood vessels, kidney disorders, and tumors of the skin and nervous system." *Id.* at 745.

[18] "Remicade" is "an anti-TNF compound (trade name Remicade) consisting of an antibody directed against TNF; it is given intravenously at one- to three-month intervals; used in treatment of regional enteritis and rheumatoid arthritis." THEFREEDICTIONARY.COM/Remicade; *see* Tr. at 302.  "TNF" is the abbreviation for "tumor necrosis factor," "a natural body protein, also produced synthetically, with anticancer effects."  MOSBY'S at 1622, 1664.

effects.  (Tr. at 452-54).  Ultimately, however, the Remicade failed to relieve her arthritic condition in any significant way.  (*Id.*).  Finally, Plaintiff's attorney asked her the following question: "When you found out you would not be able to return to work, how does [sic] it make you feel?"  In response, Jones testified:

> Sir, I felt like the lights have gone out of my life.  It was hard to bear, because I've always been a worker.  I've always been independent, and now I have to depend on others for their time and their ability to help me.  And it's not a good feeling, sir.

(Tr. at 464).

###### c.      Physical Impairments

####### 1)      Medical Facts, Diagnoses, and Opinions

The earliest available evidence shows that, from January 31, 1994, through February 5, 1994, Jones was hospitalized at The Methodist Hospital for treatment of a number of complaints.  Dr. Gold, the admitting physician, ordered a battery of tests to evaluate her "positive ANA,[19] arthralgias,[20] shingles, abdominal pain, and post herpetic neuralgia,"[21] as well as "recurrent abdominal pain and change in bowel habits."  (Ex. 1F, Tr. at 99, 104).  While she was in the hospital, Dr. Ian L. Sachs performed a colonoscopy, and removed three benign polyps from Plaintiff's sigmoid colon.  (*Id.*).  In his discharge summary, Dr. Gold reported that Jones had been prescribed Prilosec and a high fiber diet to address her gastroenterological complaints.  (Tr. at 99).  He also noted that he had "discussed the possibility of mild articular lupus, although at the present time the patient does not satisfy the

---

[19] "ANA" is an abbreviation for "antinuclear antibodies." MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY 34 (Rev. ed. 2002).  The presence of these antibodies "tend[s] to occur frequently in connective tissue diseases (as systemic lupus erythematosus, rheumatoid arthritis, and Sjogrens syndrome)." *Id.* at 47.

[20] "Arthralgia" refers to "pain in one or more joints." *Id.* at 57.

[21] "Neuralgia" is "acute paroxysmal pain radiating along the course of one or more nerves usually without demonstrable changes in the nerve structure." *Id.* at 545.

12

major/minor criteria for systemic lupus and thus we will be unable to make that diagnosis at the present time." (*Id.*).

On July 5, 2001, an orthopedic surgeon, William Hayes, M.D. ("Dr. Hayes"), performed a successful arthroscopic surgery on Jones's knee, which was to be followed by physical therapy. (Ex. 2F, Tr. at 122-41). In a record dated August 16, 2001, Dr. Hayes reported that Jones "is doing much better. Her endurance is coming back," and, he added, "[o]n physical examination her range of motion is full. Her quadriceps tone is coming back." (Tr. at 126). He concluded that, "I think she is ready to go back to full duty on 9/4/01." (*Id.*). On December 9, 2001, Jones appeared at the emergency room at Methodist Willowbrook Hospital, complaining of back pain. (Ex. 4F, Tr. at 155). She was discharged with instructions to rest, to apply moist heat and ointments, and to take Tylenol, Motrin, or Darvocet for the pain. (Tr. at 156).

Between November 17, 1999, and February 11, 2002, Jones was also treated by Arif Ali, M.D. ("Dr. Ali"), and others, at the Northwest Houston Arthritis Center. There, she received diagnoses of fibromyalgia, obesity, and depression. (Ex. 5F, Tr. at 163-83). When Dr. Ali first diagnosed her fibromyalgia, on November 17, 1999, he reported the following:

> [r]eview of systems positive for insomnia, muscle weakness, excessive fatigue, joint pain and stiffness, easy bruising, depression, anxiety, excessive thirst, nausea, heartburn, tender points in muscles, alopecia, weakness, back pain, sensitivity to sun, swelling of ankles and legs, dizziness, sinus trouble, double vision, headache, excessive weight gain [greater than 35 pounds], and low-grade fever.

(Tr. at 183). On November 19, 1999, a test was done to determine Jones's rheumatoid arthritis factor ("RA factor"). The results showed her RA factor to be less than 10.[22] (Tr. at 179). Throughout this period, Dr. Ali routinely encouraged Jones to exercise.

----

[22] Referring to "an autoantibody of high molecular weight that reacts against immunoglobulins of the class IgG and is often present in rheumatoid arthritis." *Id.* at 718. The normal range is .0-13.9. (Tr. at 312).

From May 2001, through February 2002, Jones was being treated by Helen M. Schilling, M.D. ("Dr. Schilling").  (Ex. 6F, Tr. at 185-202).  At her first appointment, on May 9, 2001, Dr. Schilling diagnosed Jones as suffering from fibromyalgia, and reported:

> The patient has multiple areas of tender points, virtually in every muscle group.  Her forward flexion, extension and side bending of the lumbar spine is 50 percent of normal range.

(Tr. at 200-01).  Dr. Schilling's treatment plan included a rehabilitation program, Wellbutrin, Ambien[23] for three weeks, "[f]ree T4[24] and TSH[25] since she does have symptoms of mood disorder," continued use of Zanaflex, and a daily walking regimen.  (Tr. at 201-02).  At an August 13, 2001, examination, Dr. Schilling noted:

> Recently she's had left leg swelling and a postoperative hematoma[26] and a lot of pain in the left leg, as she just recently had arthroscopy of the left knee, however the left knee was a work related injury.  She used crutches initially but hasn't used them since about three weeks ago, and has pain in the right groin, so severe that she can hardly walk.

(Tr. at 193).  Dr. Schilling's treatment plan was revised to include Sonata, an increase to the Celexa dosage, and testing to rule out an infection in her right knee, osteoarthritis[27] in her hip, and "radicular pain as the etiology of the groin pain."[28]  (Tr. at 194).  At an appointment on January 16, 2002, Dr.

---

[23] Ambien is "a non-bezodiazapine hypnotic indicated for short-term treatment of insomnia." PHYSICIANS DESK REFERENCE 2980 (59th ed. 2005).

[24] Referring to thyroxine, "an iodine containing hormone . . . that is an amino acid produced by the thyroid gland as a product of the cleavage of thyroglobulin, increases the metabolic rate, and is used to treat thyroid disorders." MERRIAM-WEBSTER'S at 831.

[25] "TSH" is the abbreviation for "thyroid-stimulating hormone" or "thyrotropin," "a hormone secreted by the adenohypophysis of the pituitary gland that regulates the formation and secretion of thyroid hormone." Id. at 852, 831.

[26] A "hematoma" is "a collection of extravasated blood trapped in the tissues of the skin or in an organ, resulting from trauma or incomplete hemostasis after surgery." MOSBY'S at 741.

[27] "Osteoarthritis" is a disease "characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and change in the synovial membrane.  It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1286 (29th ed. 2000).

[28] These tests found her to be within normal limits.  (Tr. at 191-92, 195-96).

Schilling advised Jones to begin outpatient pool therapy, to continue the Celexa, and to add Ambien as a sleep aid.  (Tr. at 189-90).  On January 29, 2002, Dr. Schilling concluded that Jones's sleep had improved and she discontinued the Ambien.  (Tr. at 187-88).  In the record for that day, she also noted that Jones:

> recently saw Dr. Ali, who prescribed Ultracet and also gave her a prescription for Restoril,[29] 1 or 2 at night, alternating every other night with the Ambien.  The Restoril has made her a little bit hung over.  She still has significant pain in the trapezius.  Her primary care doctors, [Christopher S. C. Sim, M.D. ("Dr. Sim")] and [William Chen, M.D. ("Dr. Chen")], took her off from work for one week.  She had hypnosis yesterday at Health Aim and thinks it was helpful.  She has been taking the physical therapy and the pool therapy, hypnosis and massage seems to be helping dramatically.

(Tr. at 187).  Finally, when Jones saw Dr. Schilling on February 12, 2002, her Celexa dosage was increased, her Ultracet prescription was refilled, and she was advised to use a heat wrap as needed. (Tr. at 185-86).  Dr. Schilling also noted that Dr. Chen wanted Jones to stop working in the meat department because he believed that the cold temperatures were aggravating her condition.  She added, however, that Jones planned to return to work for financial reasons.  (Tr. at 185, 187).

The record also documents Jones's treatment, from January 6, 2000, to April 24, 2002, by Drs. Sim and Chen.  (Ex. 9F, Tr. at 213-24).  Throughout this period, Jones was tested, diagnosed, and treated for myriad ailments, including fibromyalgia; Barrett's esophagus; hyperglycemia; hypertension; gastroesophageal reflux; rectal bleeding; respiratory illnesses; hypothyroidism; cervical and lumbar disk disease; foot, abdominal, back, cervical, and shoulder pain; cervical disropathy; hot flashes, fatigue, and decreased libido; rheumatoid arthritis; and depression.  (*Id.*).  On January 11, 2002, Dr. Chen ordered Jones to take two weeks off from work, a recommendation he later extended to an additional eight weeks.  (Tr. at 216-18).  He also sent a note to Jones's manager recommending that she be transferred to another area to escape the cold temperatures in the meat department.  (Tr. at 216).  Between March 22, 2002, and April 24, 2002, Jones was prescribed Vioxx, Zoloft, Estrotest,

---

[29] Restoril is a hypnotic agent, generally prescribed for insomnia.  *See* MOSBY'S at 1410, 1593.

and Astelin.  The Wellbutrin was discontinued, and Plaintiff was advised to stop smoking.  (Tr. at 214, 215).

In 2002, Jones returned to Dr. Gold.  (Ex. 15F, Tr. at 268-343, 356-80).  On February 20, 2002, lab tests revealed that Jones's sedimentation rate was 36, which is higher than normal.[30]  (Tr. at 321).  She also had a significantly high quantity of c-reactive protein, 54.8,[31] and a RA factor of less than 10.[32]  (Id.).  Between March 19, 2002, and May 23, 2002, Jones was treated with Vioxx,[33] among other medications.[34]  (Tr. at 312).  At a June 18, 2002, appointment, Dr. Gold informed Jones that he was considering Remicade injection treatment.  (Tr. at 313).  On July 22, 2002, Dr. Gold diagnosed Plaintiff as suffering from rheumatoid arthritis, and she began receiving the Remicade injections.  (Tr. at 302-06).  Jones received these injections regularly, at least through February 20, 2003.  (See Tr. at 270-306).  Laboratory tests in January 2003 track Jones's sedimentation rate at 96, and determined the level of c-reactive protein to be 50.8.  (Tr. at 279).  Another test, dated September 27, 2003, showed Jones's sedimentation rate to be even greater, at 108.  (Tr. at 362).

On November 21, 2002, Dr. Gold sent a letter to the SSA stating that Jones "is unable to work or obtain gainful employment at this time.  Her quality of life has been severe [sic] restricted due to

---

[30] Referring to "the speed at which red blood cells settle to the bottom of a column of citrated blood measured in milliliters deposited per hour and which is used [especially] in diagnosing the progress of various abnormal conditions (as chronic infections)."  MERRIAM-WEBSTER'S at 745.  The normal range is 0-30.  (Tr. at 312).

[31] "C-reactive protein" is "a protein present in blood serum in various abnormal states (as inflammation or neoplasia)."  MERRIAM-WEBSTER'S at 176.  The normal range is 0-4.9.  (Tr. at 312).

[32] The normal range is .0-13.9.  (Tr. at 312).

[33] Vioxx is "a nonsteroidal anti-inflammatory drug."  PHYSICIANS DESK REFERENCE at 2172.

[34] On March 12, 2002, ophthalmologist Burt A. Ginsburg, M.D. ("Dr. Ginsburg"), wrote to Dr. Gold concerning an eye exam he performed on Jones at Dr. Gold's request.  (Tr. at 327-28).  Dr. Ginsburg had the impression that Jones had congenital hypertrophy of the retinal pigment epithelium, and expressed a concern about her taking Plaquenil, one of the drugs that was used to treat Jones's fibromyalgia and rheumatoid arthritis.  (Id.).  At the hearing, Jones stated that she eventually had to stop taking Plaquenil because of problems with blood vessels in her eyes, for which she later received treatment as well.  (Tr. at 450-51).

her chronic illness and depression." (Ex. 15F, Tr. at 281-82). In his letter, Dr. Gold reported that he had diagnosed Jones as suffering from rheumatoid arthritis in 1991, and that her condition had been deteriorating since that date. (Tr. at 281). He explained her condition in the following terms:

> Her arthritic condition is complicated by other health problems to include hypothyroidism, gastritis, gastrointestinal reflux disease, systemic lupus, lumbar disc disease, endometriosis, allergic rhinitis, and depression with periodic bouts of panic attacks. This patient has undergone numerous therapies for the symptoms associated with her rheumatoid arthritis and has not experienced adequate benefits and relief. Specifically, the patient has failed to adequately respond to [Plaquenil, Vioxx, Ultracet, Zanaflex,] and anti-inflammatory medications without success.

(*Id.*). He also reported that she had shown little improvement:

> Recently, Ms. Jones has been experiencing increased joint pain and swelling, decreased mobility which is affecting the patient's lifestyle. Specifically to detail the patient's present symptoms[:] the patient is experiencing increased difficulty grasping and gripping items with both hands. Flexion of the elbows is difficult at times and raising the arms to shoulder level causes discomfort, especially on the left side. There is pain in the lumbar-sacral region [which] radiates into legs, especially on the right side. This in turn causes the patient to lose balance and she has on several occasions fallen. The knees also frequently lock and this causes problems with ambulation. Prolonged sitting, stooping and bending is painful. Cortisone injections in ankles have not been successful and the foot pain and deformity in toes makes it also increasing [sic] difficult for this patient to walk or stand for prolong [sic] periods of time. She is presently undergoing Remicade infusion therapy which we hope will be successful in her complicated case. In my professional opinion, the patient's disease is guarded at this time.

(Tr. at 281-82).

On September 8, 2003, Dr. Gold complied with the SSA's request for a physical residual functional capacity ("RFC") evaluation on Jones. (Ex. 16F, Tr. at 348-55). Among the other ailments referenced in that RFC, Dr. Gold diagnosed Plaintiff as suffering from rheumatoid arthritis, osteoporosis, and depression. (Tr. at 348). He concluded that her prognosis for improvement was "poor," detailing that, since January 1, 2000, her symptoms and limitations had progressed to the point that pain frequently interfered with her ability to concentrate. (*Id.*). He also reported that Jones is severely limited in her ability to handle work stress. (*Id.*). Dr. Gold found that she was unable to

walk one city block without the need to rest; that she was unable to sit or stand continuously for more than 10 minutes at a time; and that she was unable to sit, stand, or walk for more than two hours in an eight-hour work day.  (*Id.*).  He further reported that Jones needs a cane or other device to assist her mobility, and that she cannot lift even five-pound items in a competitive work setting.  (*Id.*).  In addition, he reported that she is unable to bend or twist.  (*Id.*).  Finally, he stated that Jones's condition is not likely to vary.  (*Id.*).

### 2)    Expert Testimony

At the hearing, the ALJ heard testimony from three expert witnesses, none of whom had ever treated or examined Jones.  One of these, Dr. Vern Laing, an internist and immunologist, based his testimony solely upon his review of the medical records and Jones's testimony at the hearing.  (*See* Tr. at 478).  From those records, Dr. Laing concluded that Jones's most dominant impairment is "a pain syndrome."  (*Id.*).  After identifying her condition as such, Dr. Laing turned to Dr. Gold's records, specifically his "working diagnosis" of rheumatoid arthritis.  (Tr. at 479).  Dr. Laing acknowledged that Jones's sedimentation rate had been persistently and significantly elevated; that she reportedly experienced joint pain; that she had received "cutting edge therapy" for rheumatoid arthritis; and that her ANA was positive, a finding commonly associated with rheumatoid arthritis. (Tr. at 479-81).  *See Merriam-Webster's* at 34, 47 (regarding the connection between a positive ANA and rheumatoid arthritis); *Gutzman v. Apfel*, 109 F. Supp. 2d 1129, 1131 (D. Neb. 2000) (same). However, he testified that the SSA listing for rheumatoid arthritis requires showings that are absent in Jones's case, including objective evidence of "swelling and tenderness," as well as current findings of "joint inflammation or deformity of two or more major joints."  (Tr. at 479-80 (citing Listing 14.09)).  Dr. Laing then told the ALJ that he could not point "to any examination where we showed the classic changes of rheumatoid arthritis," which would support that diagnosis, adding, "and to make it even more confusing, her rheumatoid factor is negative."  (Tr. at 480).  Dr. Laing also

testified that, several times, Dr. Gold noted a "negative review of symptoms" following a physical

examination.  (Tr. at 482).  For that reason, Dr. Laing told the ALJ that he "cannot objectify" Jones's

reported symptoms of "severe joint pain, muscle pain, and weakness."  (Tr. at 483).  In Dr. Laing's

opinion, then, Dr. Gold's findings, as detailed in the RFC evaluation, were not supported by the

records.  (Tr. at 483-84).

In response to questions from Plaintiff's attorney, however, Dr. Laing conceded that he is not

a rheumatologist.  (Tr. at 490).  He then testified that:

> . . . interesting enough, I don't see any evidence in this record that anyone else was
> a rheumatologist.  And if there is, I would like to see it. . . .  I would love to have a
> rheumatologist's opinion.  In fact, I was going to recommend to the Judge that we get
> one.  I think that would be an enhancing thing, because of the severe RFC put forth
> by the treating source.

(*Id.*).  In testifying about Jones's other reported physical impairments, Dr. Laing stated:

> This case started as a rheumatoid arthritis case.  Now we've moved into a spine case,
> and that's fine, but we're really into an entirely different arena with this, and I would
> tell the Judge and you and everyone else, I think an orthopedic -- if this case hinges
> on an orthopedic abnormality, it's not a matter of my being incompetent.  I'm not an
> orthopedist.  I'm an internist and an immunologist.  Not an orthopedist, and I can't
> really go any further in commenting on this, because it wouldn't -- it wouldn't be fair
> to anyone involved.

(Tr. at 489).

The ALJ also had the benefit of testimony from Tom King, a vocational expert.  From his

review of the record, as well as from the hearing testimony, Mr. King described Jones's work history

as unskilled labor, which required a medium level of physical exertion.  (Tr. at 497).  The ALJ then

posed hypothetical questions to the expert witness, which  incorporated some of Jones's limitations,

including those on her ability to stoop, crouch, or climb.  Mr. King testified that such a person could

perform light, unskilled work as an information clerk, an office helper, or a "sorter."  (Tr. at 498).

Mr. King further testified that a person with the specific limitations outlined by the ALJ could work

as an order clerk, a "quotation clerk," or an "addressor."  (Tr. at 499).  He also told the ALJ that all

of the jobs he identified were available in significant numbers in the regional and national economy.

(*See* Tr. at 497-99).  However, the following exchange took place between Plaintiff's attorney and the expert witness:

> Q Assume that the claimant cannot perform fine bilateral manipulation of the hands.  How would that affect her ability to perform any of the jobs the Administrative Law Judge mentioned in his sedentary hypothetical?
>
> A  The person could not perform sedentary work without bilateral dexterity.
>
> Q  And why is that?
>
> A  You need both hands to do sedentary work.
>
> *   *   *
>
> Q  Okay.  Assume farther [sic] that because of the medication the claimant is taking, she's had to lay down two to three hours per day and that would be doing [sic] a normal eight-hour workday.  Would there be any jobs in the national economy she could perform?
>
> A  No.
>
> Q  Assume further that because of the claimant's medical condition, she would need to be in an environment where she could sit and stand at will, and I'm speaking out [sic] she would need to be able to stand up at least 10 times per day or even sit down or lay down 10 times per day at 15 hour -- I mean, 15 minutes each time she would lay down.  Would there be any jobs in the national economy she could perform based on my hypothetical?
>
> A  No.
>
> Q  Assume further that claimant cries during the day, at least once or twice a day, and let's say at 30 minutes per crying spell, would there be any job in the national economy she could perform under those circumstances?
>
> A  If that was on a continuous basis day-in and day-out in an eight-hour workday, I would say none.
>
> Q  Assume farther [sic] that the claimant would be absent from work three -- two to three days per month on a continuing basis month after month either because of sickness or because of medical appointments, would there be any jobs in the national economy she could perform based upon that hypothetical?
>
> A  No.

20

(Tr. at 499-501).

### 3)     The ALJ's Decision

Following the hearing, the ALJ made his written findings on the evidence.  From his review of the record, he determined that Jones suffered from both a "major depressive disorder and a pain syndrome," and he found both conditions were "severe."  (Tr. at 25).  He found further that, due to these impairments,  Jones was unable to return to any of her past work.  (Tr. at 32).  Ultimately, however, the ALJ concluded that Jones is capable of performing a significant number of jobs which exist in the local, regional, and national economy, and so she is "not disabled," under the Act.  (*Id.*). With that conclusion, he ruled that Jones was not entitled to disability insurance benefits.  (*Id.*).

From the record as a whole, however, it is evident that the ALJ's decision is not supported by substantial evidence.  The ALJ referred to the sum of Plaintiff's maladies as a "pain syndrome," stating that:

> . . . the medical expert, Vern O. Laing, M.D., testified that based on his review of the medical evidence of record, the claimant had a pain syndrome with persistent elevations of sedimentation rates, using a diagnosis of rheumatoid arthritis.  He indicated that although the claimant has received cutting edge treatment for rheumatoid arthritis, there is no objective evidence of record that the claimant actually has rheumatoid arthritis other than having a positive sedimentation rate and positive ANA.  However, he indicated that the claimant has had a negative rheumatoid factor.

(Tr. at 27).  The ALJ then presumably rejected both Dr. Gold's diagnosis of rheumatoid arthritis and his RFC assessment, relying instead on Dr. Laing's opinion.  The ALJ concluded that "the claimant's treating physician's opinions were not based on objective medical findings but rather on subjective complaints."  (Tr. at 29).  But the law is clear that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons to do so.  *Schwartz v. Barnhart*, 70 Fed. Appx. 512 (10th Cir. 2003).  In fact, the Fifth Circuit "has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability."  *Loza*, 219 F.3d

at 395; *see Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237.  However, it is also true that "[t]he

law is clear that, although the opinion of an examining physician is generally entitled to more weight

than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician

when the evidence supports a contrary conclusion."  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir.

1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)).  And it is equally well-

settled that an ALJ must evaluate every medical opinion that is received on a claimant's behalf, and

he cannot reject the opinion of a treating physician without "good cause" to do so.  *See* 20 C.F.R. §

404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455-56; *Greenspan*,

38 F.3d at 237; *Scott*, 770 F.2d at 485.  "Good cause" may exist when the treating physician's

statements are "brief and conclusory, not supported by medically acceptable clinical laboratory

diagnostic techniques, or otherwise unsupported by the evidence."  *Myers*, 238 F.3d at 62l; *see*

*Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456.  But Fifth Circuit precedent is clear

that:

> A finding that a treating source medical opinion is not well supported by medically
> acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the opinion is not entitled to
> "controlling weight," not that the opinion should be rejected.  *Treating source medical*
> *opinions are still entitled to deference and must be weighed using all of the factors*
> *provided in 20 C.F.R. § 404.1527 and 416.927.*  In many cases, a treating source's medical
> opinion will be entitled to the greatest weight and should be adopted even if it does not
> meet the test for controlling weight.

*Id.* (quoting SSR 96-2p).  For that reason, a claimant is entitled to a remand if the ALJ rejects, or

gives little weight to, a treating doctor's opinion without considering each of the factors set out in

the Social Security regulations.[35]  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456.

---

[35] Those factors are as follows:
    (1) the physician's length of treatment of the claimant;
    (2) the physician's frequency of examination;
    (3) the nature and extent of the treatment relationship;
    (4) the support of the physician's opinion afforded by the medical evidence of record;
    (5) the consistency of opinion with the record as a whole; and
    (6) the specialization of the treating physician.

Further, even if the ALJ does show "that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight," but the record lacks sufficient medical evidence to contradict the disputed assessment, then "the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)." *Id.* at 453. That regulation provides that a treating physician's records are considered "inconclusive" if they "contain[] a conflict or ambiguity that must be resolved"; if they do "not contain all the necessary information"; or if they do "not appear to be based on medically acceptable clinical and laboratory techniques." *Id.* at 457 (quoting 20 C.F.R. § 404.1512(e)(1)). "Reversal, however, is appropriate only if the applicant shows prejudice from the ALJ's failure to request additional information." *Id.* at 458. To make such a showing, the claimant must demonstrate "that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision"—that the claimant "'could and would' have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)); *Newton*, 209 F.3d at 458 (quoting *Ripley*, 67 F. 3d at 557 n.22); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (quoting *Kane*, 731 F.2d at 1220).

Here, the ALJ was explicit that he "rejects the opinion of the claimant's treating physician as his opinion[s] at Exhibit 15F, pages 15 and 16 and Exhibit 16F, pages 2-9, are not supported by the objective medical evidence of record." (Tr. at 29). He then cited a number of purported "physical examination[s]" that Dr. Gold performed between October 2002 and October 2003.[36] (*Id.*). The ALJ found that, on those dates, Jones was reported to be "normal." (*Id.*). He also

---

*Newton*, 209 F.3d at 456; *see Myers*, 238 F.3d at 621; 20 C.F.R. § 404.1527(d)(2)-(6).

[36] October 2002 (Ex. 15F-17, Tr. at 283; Ex. 15F-22, Tr. at 288); January 2003 (15F-12, Tr. at 278); February 2003 (15F-5, Tr. at 271; Ex. 15F-7, Tr. at 273); March 2003 (15F-3, Tr. at 269); May 2003 (17F-24, Tr. at 379); September 2003 (17F- 10 & 11, Tr. at 365-66); and October 2003 (17F-2, Tr. at 357).

considered the opinions expressed by Dr. Gold in his correspondence with the SSA.  The ALJ deemed these to be "contradicted" by those reportedly "normal" examinations.  (*Id.*).  As Plaintiff points out, however, none of the reports that the ALJ relied on is actually from one of Jones's physical examinations.  (*Id.*).  In fact, one of these "normal examinations," is merely the report of blood test results which show that Jones's Thyroxine (T4) and TSH, thyroid hormones, were within the normal range.  The remainder of the "normal" examinations cited by the ALJ are excerpts from Plaintiff's medical history, most of which are barely legible, and none of which appears to contain a diagnosis or clinical findings.  (*See, e.g.*, Ex. 15F-12, Tr. at 278; Ex. 17F-24, Tr. at 379).  And, while it is admittedly unclear, it appears that the ALJ's conclusion that these "examinations" were "normal," may have been based on his own interpretation of the medical forms used by Dr. Gold. At the top of each form cited by the ALJ, are two columns, labeled "ROS" and "PE," which list terms such as "extremities" and "joints," followed by spaces in which one can note "positive" or "negative" findings.  On these forms, Dr. Gold, or someone in his office, drew a single line through the spaces marked "negative" in each column.  Presumably, the ALJ interpreted this to mean that Dr. Gold found Jones's exams to be "normal."  However, it is equally plausible that the lines simply indicate that portion of the form was irrelevant to the examiner.  Indeed, the lines appear to be drawn haphazardly, often not even crossing through the entire column labeled "negative."  (*See id.*).

On this record, then, none of the evidence cited by the ALJ as conflicting clinical data appears to be from her treating physician's "physical examinations."  That evidence is, at best, ambiguous.  Further, a review of Dr. Gold's other records sheds greater doubt on the ALJ's interpretation.  Indeed, from October 2002 to October 2003, Dr. Gold repeatedly diagnosed Jones as suffering from rheumatoid arthritis, and he treated her for that disease.  (*See, e.g.*, Tr. at 268, 270, 271, 276, 285, 288).  It is not likely that Dr. Gold would proceed in this manner if there were simultaneous findings, in routine examinations, that Jones was "normal."  For these reasons, the

records specifically relied upon by the ALJ, in rejecting Dr. Gold's opinion, do not support his decision to do so.

The ALJ also placed undue importance on Jones's negative test result for the RA factor.  He deemed those negative results to indicate a flawed diagnosis for rheumatoid arthritis.  However, it is well accepted that negative RA factor results, alone, do not exclude the possibility of rheumatoid arthritis.  *See Gutzman*, 109 F. Supp. 2d at 1131 n.2; *ABC of Rheumatology* 54 (3d ed. 2004); Vol. 8A, 270 *Proving Medical Diagnosis and Prognosis* § 270.02 (Ravel 1995).  In fact, many authorities have noted that an RA factor "is neither universally present in rheumatoid arthritis nor specific for it."  *ABC of Rheumatology* at 54; *see Gutzman*, 109 F. Supp. 2d at 1131 n.2.  Indeed, one opinion noted that in 20 to 30 percent of the cases of known rheumatoid arthritis, negative RA factor tests were present in the record.  *See id.*; *see also ABC of Rheumatology* at 54; 270 *Proving Medical Diagnosis and Prognosis* at § 270.02; *Harrison's Principles of Internal Medicine* 1945 (6th ed. 1970).  Clearly, then, a negative RA factor does not signal the absence of rheumatoid arthritis.

Further, the ALJ relied on Dr. Laing's testimony that he found no objective evidence to support a diagnosis of rheumatoid arthritis.  (Tr. at 490).  However, when questioned later, Dr. Laing acknowledged that he is not a rheumatologist, and he was explicit in urging that a rheumatologist review Jones's condition to obtain an accurate assessment of her status:

> I would love to have a rheumatologist's opinion.  In fact, I was going to recommend to the Judge that we get one.  I think that would be an enhancing thing, because of the severe RFC put forth by the treating source.

(*Id.*).

Finally, there is other record evidence which corroborates Dr. Gold's findings.  For example, a positive ANA test result "indicates the presence of special proteins called antinuclear antibodies in the blood which are associated with autoimmune diseases, such as rheumatoid arthritis or lupus."

*Gutzman*, 109 F. Supp. 2d at 1131; *see ABC of Rheumatology* at 54; *Merriam-Webster's* at 47.  In addition, c-reactive protein "is present in a large percentage of cases of active rheumatoid arthritis, as well as many bacterial infections."  Vol. 8A, 270 *Proving Medical Diagnosis and Prognosis* § 270.02 (Fishback 1996); *see ABC of Rheumatology* at 54.  Further, there can be no dispute that elevated sedimentation rates are associated with rheumatoid arthritis.  *Id*.  Here, several of Jones's tests were positive for ANA, as well as for the presence of c-reactive protein.  (*See, e.g.*, Ex. 1F, Tr. at 99, 102; Ex. 5F, Tr. at 179-80; Ex. 15F, Tr. at 279, 321, 362).  All of these objective findings lend support to Dr. Gold's diagnosis.

Here, the court is persuaded that the ALJ did not have sufficient reason to reject the opinions given by Plaintiff's long-term treating physician.  Nor did he give adequate consideration to whether Dr. Gold's opinion was supported by, or consistent with, the record as a whole.  *See Newton*, 209 F.3d at 456.  In sum, nothing in the record truly contradicts Dr. Gold's clinical findings.  Absent such a contradiction, the ALJ did not make the necessary showing to give his findings less than controlling weight.  In this instance, the record must be developed further on Plaintiff's physical limitations before a creditable determination on her claimed disability can be reached.  At a minimum, it is not at all clear that the evidence that the ALJ relied on does, in fact, refute Dr. Gold's opinion.  For this reason, Dr. Gold should be contacted to explain those records, or to clarify any ambiguities in the record the ALJ has identified.  *See id.* at 453.  For these reasons, the ALJ's decision to reject the opinion from Jones's treating physician clearly prejudiced her claim.  *See Carey*, 230 F.3d at 142.  It is clear that Plaintiff has a long history of treatment for rheumatoid arthritis, and, in her own doctor's opinion, this condition renders her unable to work.  While Dr. Laing surmised that such a diagnosis is not supported by the evidence, he testified quite decidedly that a rheumatologist is the practitioner best suited to render opinions on Plaintiff's level of impairment.  His express recommendation to the ALJ that a rheumatologist evaluate Jones should have been adopted.  The

court is persuaded that, here, the ALJ had a duty to develop the record further on Jones's "pain syndrome," and the limits, if any, on her ability to return to work.  The fact that the medical expert himself expressed the need for a rheumatologist's opinion weighs in favor of a remand to develop the record on that issue alone.

Moreover, because the ALJ apparently considered all of Jones's impairments under the umbrella of a "pain syndrome," and the diagnosis of rheumatoid arthritis, he did not separately address her other claimed impairments, including fibromyalgia.  Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue."  *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004).  Common symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease."  *Id.* at 589-90 (citing *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003)).  It has been recognized that the cause of fibromyalgia,

> is unknown, there is no cure, and it is poorly-understood within much of the medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.  The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis.

*Id.* at 590 (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 872 (9th Cir. 2004); *Brosnahan*, 336 F.3d at 672 n.1).  Indeed, in *Benecke*, the court held that the "ALJ erred by 'effectively requir[ing] "objective" evidence for a disease that eludes such measurement.'"  *Id.* at 594 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)).

Here, the record is replete with evidence that Jones has been diagnosed as suffering from fibromyalgia, and that she has been treated her for it on a regular basis.  (*See* Ex. 5F, Tr. at 163-83; Ex. 6F, Tr. at 185-202; Ex. 9F, Tr. at 213-24).  In fact, the ALJ recognized the diagnosis, and appears to have found support for that in the record:

> The medical evidence of record documents the claimant to have a medical history significant for a documented diagnosis of fibromyalgia. The claimant had reported complaints of diffuse musculoskeletal pain in her bilateral ankles, hips, elbows; and also multiple tended points in the proximal muscles of the lumbosacral area and to the upper extremities. The claimant was also noted to have alopecia and complaints of occipital headaches with radiation to the cervical area; excessive fatigue; and insomnia due to pain. She was noted to have been taking Plaquenil 200 mg. However, it was noted that the claimant had to discontinue taking the medication due to ruptured blood vessels in her eyes. The claimant also has a documented history of elevated sedimentation rates.

(Tr. at 25). However, the ALJ did not assess the impact of Jones's fibromyalgia independently, and its effects, if any, either alone or in combination with her other serious impairments, to accurately determine her residual functional capacity. For that reason, as well, a remand is required to allow further consideration of that documented impairment.

### d.      Obesity

#### 1)      Medical Facts, Diagnoses, and Opinions

In an Obesity Questionnaire submitted on September 8, 2003, Dr. Gold reported that, on that date, Jones was five feet, eight inches tall, and she weighed 242 pounds. (Ex. 6F, Tr. at 185-202). According to the Body Mass Index ("BMI") chart,[37] which measures "body fat based on height and weight," Jones's BMI was 37 at that time. (*See id.*; Tr. at 435-36). A person with a BMI between 30 and 39 is considered "obese," and a person with a BMI of 40 or greater is considered to suffer from "extreme obesity." (Tr. at 436). The record reflects that, during the relevant time period, Jones's BMI fluctuated between the obese range and the extremely obese range. On March 1, 2002, she reached her highest recorded weight, 286 pounds, or a BMI of 43. (Tr. at 430, 436). At the hearing, neither Dr. Laing nor Mr. King testified about whether Jones's obesity affected her ability to perform in the work place. In fact, Dr. Laing stated that, "We're not technically even supposed to consider that." (Tr. at 492).

---

[37] Published by the National Heart, Lung, and Blood Institute. (*See* Tr. at 435-36).

### 2)      The ALJ's Decision

Plaintiff argues that it was error for the ALJ not to evaluate the effect of her obesity in reaching his decision.  It is true that, here, the ALJ did nothing more than note that Jones was obese; he did not discuss the effects, if any, that obesity might have, either singly, or in combination with her other impairments.  Under the prevailing regulations, however, the ALJ is required to assess the combined effect of a claimant's impairments when determining whether she has a severe condition or conditions which render her disabled.  *See* 20 C.F.R. § 404.1523; *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989).  The regulations provide specifically that the ALJ "will consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523; *see Walker*, 889 F.2d at 49-50; *Cook*, 783 F.2d at1168, 1174 (4th Cir. 1986).  That includes the duty to consider the impact of obesity.

"[O]besity, as other medical impairments, will be deemed a 'severe' impairment, 'when alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities.'" *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (quoting SSR 02-01p (2002)); *see Skarbek*, 390 F.3d at 504.  "In determining whether a claimant's obesity is a severe impairment, an ALJ must 'do an individualized assessment of the impact of obesity on an individual's functioning.'" *Burch*, 400 F.3d at 682 (quoting SSR 02-01p (2002)); *see Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006).  Here, there is no dispute that Jones has consistently been within the obese or extremely obese weight range.  In light of this evidence, the ALJ should have addressed the impact of her weight on her functional capacity.  His failure to acknowledge and consider that factor requires a remand so that Plaintiff's actual RFC can be determined.  *See Boston v. Barnhart*, 332 F. Supp. 2d 879, 887 (D. Md. 2004).

### e.  Mental Impairments

### 1)  Medical Facts, Diagnoses, and Opinions

Finally, the medical records contain numerous references to Jones's suspected or diagnosed mental impairments.  On May 10, 2001, for example, Dr. Schilling noted that Jones was suffering from a mood disorder, as well as from sleep disturbances, for which she recommended medication and exercise.  (Tr. at 200-02).  On her next visit, on June 12, 2001, Dr. Shilling noted that Jones was "crying here today, telling me that she feels bad, she feels nauseated, her eyes feel locked and she feels so severely depressed."  (Tr. at 198).  Similarly, Doctors Sim and Chen, Ali, and Gold, all characterized Jones as depressed, and each doctor prescribed medications for her depressive symptoms.  (*See, e.g.*, Ex. 5F, Tr. at 172; Ex. 9F, Tr. at 216; Ex. 15F, Tr. at 313).

On June 17, 2002, Dr. Prabhu, an examining psychiatrist, reported that Jones had "major depression with anxiety"; "[p]sychosocial [s]tressor:  physical problems, moderate"; and a GAF of 45.[38]  (Ex. 10F, Tr. at 225, 227).  In discussing her mental state, Dr. Prabhu concluded that:

> Mrs. Jones has frequent tearful episodes, but she denies suicidal ideation.  She reports low energy, and motivation, and isolation.  She reports difficulty falling asleep and EMA's, significant problems with recent memory and concentration, and getting lost easily.  She admits to auditory hallucinations, and hears a male voice calling her name.  She reports increased anxiety, but denies panic attacks.  She does admit to, "getting hysterical," and screaming when she get[s] anxious or frustrated. . . .  "I tried to tell my mind to ignore [the pain] but only became hysterical and had to go to the emergency room."  She has not made any attempts to return to work, due to not being able to stand and walk for any length of time, and not being able to handle stress.  She has never been hospitalized for psychiatric treatment, and is not currently seeing a psychiatrist.  She was prescribed zoloft 100 mg daily, by her medical physician, Dr. Sim.  Ms. Jones reports that the medication is somewhat helpful, "but not like it should be," and sometimes leaves her feeling lethargic.

---

[38] The GAF scale is used to rate "overall psychological functioning on a scale of 0-100," with 100 representing "superior functioning."  AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994).  A GAF of 45 may indicate the presence of serious mental disturbances, or of moderate social or occupational difficulties, including an inability to retain a job.  *Id.*

(Tr. at 225-26).  Dr. Prabhu reported Jones's "chief complaints" in her own words:  "I feel hopeless, anxious, and worthless," and, "I feel like I am a hardship on my family."  (Tr. at 225).

On December 5, 2003, Dr. Nancy Tarrand completed a psychiatric review technique form for the state.  She found that Jones had a "[d]epressive syndrome," which was characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty in concentrating or thinking.  (Ex. 20F, Tr. at 404).  She also found that Jones was mildly or moderately limited in activities of daily living; social functioning; and in maintaining concentration, persistence, and pace.  (Tr. at 411).  At the hearing before the ALJ, Dr. Tarrand testified that she saw no evidence that Jones had ever received ongoing treatment from a psychiatrist.  (Tr. at 472).  She did recognize, however, that Jones had received treatment for depression from her primary care doctors.  (Tr. at 477).  She then referred to the evaluation that Dr. Prabhu had done, in which he diagnosed Jones as suffering from major depression, with anxiety.  (*Id.*; Tr. at 472; Ex. 10, Tr. at 225-28).  Dr. Tarrand testified, however, that the symptoms he documented, namely, "sleep disturbances, problems with energy, feelings of guilt and difficulties concentrating," did not satisfy any SSA listing.  (Tr. at 472-73).  Finally, she commented on Jones's GAF score of 45, but testified that, in her opinion, the GAF scale is "fairly useless the way it's used clinically."  (Tr. at 473-74).

### 2)       The ALJ's Decision

In his written decision, the ALJ found that Jones "has major depressive disorder" which  is "'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed . . . ."  (Tr. at 25).  He addressed Dr. Prabhu's findings in the following manner:

> The medical evidence of record further shows the claimant to have been diagnosed with major depression and anxiety.   The claimant underwent a psychiatric examination on June 17, 2002.  On mental status examination, the claimant was described as an obese individual who walked with a slow gait and used a metal cane for support.  Her thought process was noted as fairly sequential and logical and it was

31

noted that she appeared to be preoccupied with her inner thoughts.  The claimant admitted to hearing a male voice calling her name throughout the day but denied paranoid ideas.  The claimant's psychomotor activity was decreased, her affect was near tearful at times, and her mood was depressed.  However, the claimant denied suicidal ideas or intent.  She was oriented as to person, place, and time, and her memory for remote, recent, and immediate events was good.  The claimant's concentration was fair and her abstracting ability was good.  The claimant showed good insight into her problems, her judgment was good, intellect was average, and her fund of knowledge was good.  She was diagnosed with major depression with anxiety.

(Tr. at 27).  However, the ALJ never discussed Jones's low GAF score, or the limiting effect, if any, of her mental impairment.

The GAF scale ascribes a numeric range from 1 ("persistent danger of severely hurting self or others") to 100 ("superior functioning") as a way of categorizing a patient's emotional status.  *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* at 32.  A GAF of 41-50 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  *Id.*  It is clear that an ALJ considering a claimant with a GAF of only 45 should address the issue in some way.  If, for instance, he finds that the score does not accurately reflect the claimant's condition, or it is not supported by other evidence in the record, he should explain that as part of his decision.  In this case, there is no way to know whether the ALJ would have reached a different decision if he had taken due consideration of Jones's GAF score, and the attendant limitations such a score implicates.  Clearly, a low GAF score can impact one's ability to engage in competitive employment.  Certainly, if Jones's score of 45 accurately reflects her persistent mood, and functional capacity, the ALJ's failure to address it is prejudicial to her.  A remand is warranted so that the ALJ can address the impact of Jones's mental impairment, including her GAF score, on her residual functional capacity.

From the record, as whole, it is clear that Jones is entitled to a  remand so that the ALJ may properly develop the administrative record on the effects of her rheumatoid arthritis or fibromyalgia;

the effects of her obesity in combination with her other impairments; and the limitations, if any, to her RFC based on her GAF scale score of 45.  The Fifth Circuit has emphasized that judicial review is always necessarily focused on whether the ALJ's decision is supported by substantial evidence in the existing record.  *Ripley*, 67 F.3d at 557.  But the court also added gave force to the Social Security regulations, which provide that RFC determinations must evaluate the claimant's ability "to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions."  20 C.F.R. § 404.1545(a) (2002).  The regulations require such determinations to be cast in terms of a claimant's ability to perform "work activity on a regular and continuing basis."  20 C.F.R. § 404.1545 (b) (2002).

As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required."  *Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)).  "If prejudice results from the violation, the result cannot stand."  *Id.*  Clearly, Jones's rights were affected because the ALJ abrogated his duty to develop the record fully as to her rheumatoid arthritis and fibromyalgia, her obesity as it affects her other limitations, and her mental state.  *See* 20 C.F.R.  § 404.1545(a) (1986).  For that reason, the matter must be remanded, under sentence four of 42 U.S.C. 409(g), so that the record can be developed fully, in accordance with the law, which will allow the ALJ to render a decision that is supported by substantial evidence.

### 4.    Conclusion

Based on the foregoing, it is ORDERED that Plaintiff Beverly A. Jones's Motion for Summary Judgment is GRANTED, and that Commissioner Jo Anne B. Barnhart's Motion for Summary Judgment is DENIED.

It is further ORDERED that this matter be remanded to the Commissioner so that the record may be developed adequately, under the prevailing law.  Additions to the evidence must include clarification from Dr. Gold on his clinical findings; an opinion from a rheumatologist; an assessment of the degree of Jones's fibromyalgia, including further medical exams, if necessary; a consideration of the degree, if any, to which Jones's obesity affects her other impairments; and the limitations to her residual functional capacity based on her GAF score of 45.  *See Latham*, 36 F.3d at 484; *Newton,* 209 F.3d at 456.

This is a FINAL JUDGMENT.

The Clerk of the Court shall enter this order and provide a true copy to all counsel of record.

**SIGNED** at Houston, Texas, this 14th day of June, 2006.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**